UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80818-CIV-HURLEY

HEMAN PANCHOOSINGH,

    Plaintiff,

vs.

GENERAL LABOR STAFFING
SERVICES, INC.,

    Defendant.
_____/

ORDER DENYING IN PART & GRANTING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DE# 30]

Plaintiff Heman Panchoosingh ("Panchoosingh") sues his former employer, General Labor Staffing Services, Inc. ("General Labor" or "the company"), asserting national origin and religious discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq*. and §760.10, Fla. Stat. (2003) (Counts 1 and 2). He also asserts claims for retaliatory discharge under the Florida Whistleblower Act, § 448.102(3), Fla. Stat. (2003) (Count 3), breach of shareholder agreement (Count 4) and *quantum meruit* (Count 5).

The case is now before the court on the defendant's motion for summary judgment on the discrimination and whistle- blower claims [DE# 30]. For reasons discussed below, the court has determined to grant the motion on the whistleblower claim, and to deny the motion in all other respects.

## I. Fact Background[1]

1. Plaintiff Heman Panchoosingh is a practicing Hindu of East Indian descent.

2. General Labor is a day labor staffing firm founded by Gerry Califano (President), and Larry Minei (Vice-President) in 2001. At its inception, Califano and Minei invited Heman Panchoosingh, Robert Conde and Robert De La Paz to join as shareholders holding a 5% stake in the new venture. Previously, Califano, Minei, Panchoosingh, Conde and De La Paz all worked for a staffing company known as Tandem Staffing.

3. Panchoosingh originally served as branch manager of the company's Pompano branch office at a base salary of $55,000 plus performance bonuses. He subsequently rotated through the company's Lake Worth, Stuart and Riviera Beach offices, successfully raising the company's performance levels at each and eventually earning up to $200,000.00 per annum in recognition of his efforts.

4. At the time of original hire, Panchoosingh was the only employee of Indian descent and the only Hindu employed by General Labor.

5. According to Panchoosingh, Califano knew that he was a practicing Hindu from the inception of their relationship, and constantly barraged him with overtures to convert to the Christian faith. Califano allegedly talked constantly about his devotion to Christianity to employees and customers alike, and Panchoosingh estimated that Califano's religious discussions consumed up to five hours of the average eight hour work day.

---

[1] In determining whether there is a disputed issue of material fact that prevents summary judgment, the court must consider all evidence in the light most favorable to the plaintiff, *Garcia v Pueblo Country Club*, 299 F.3d 1233, 1236-37 (10th Cir. 2002), and must resolve all reasonable doubts about the facts in favor of the plaintiff as the nonmovant. *Cooper Tire & Rubber Co. v Farese*, 423 F.3d 446, 456 (5th Cir. 2005).

At various times, Califano allegedly pleaded with Panchoosingh to "save" himself by becoming baptized, and mocked Panchoosingh for "praying to a rat god." In addition, Califano gave Panchoosingh a Bible with his named engraved on it, along with a "working bible" or "study bible" intended as a tablet for religious expression, and invited Panchoosingh to his church for the occasional Friday fish fry and holy day religious observations. Califano allegedly reminded him throughout that "This is a Christian company and there is no place in the company for anyone who is not Christian."

6. In his deposition testimony, Califano denied making these comments or even knowing that plaintiff was a Hindu. However, he did not dispute his tendency toward engaging in religious discussion and habit of quoting scriptures to all of his branch managers (Heman Panchoosingh, Robert Conde, Robert De La Paz, and Eddie Nunez). Also, he conceded that he gave each of his managers Bibles as gifts.

7. Panchoosingh claims that he complained to Vice-President Minei about his discomfort with Califano's constant religious exhortations and negative comments on his Hindu religious affiliation as early as 2001, and continued to voice objection to Califano's constant religious lecturing throughout his tenure with the company.

8. In early 2003, Panchoosingh claims that he also complained directly to Minei and Califano about the company's illegal use of unauthorized alien workers. He says that Califano promptly reprimanded him for doing so, and cautioned against telling him how to run his business.

9. On November 18, 2003, Vice-President Larry Minei issued a written "counseling statement" to Panchoosingh citing him for: (1) failure to manage and direct subordinates who were allegedly cutting their own paychecks; (2) failure to service and visit customers; (3) creating a

conflict of interest by supplying his brother's business with workers' compensation insurance certificates, despite the fact the brother did not do business with General Labor, and (4) a drop in sales performance.

10. In March, 2004, Califano followed up with a formal written evaluation of plaintiff's interim performance, assigning him a "fair" rating on training, employee responsibilities, office organization, leadership and time management. In this writing, Califano emphasized the need for Panchoosingh to "control risk" by ensuring that an I-9 form was filled out before dispatching an employee, and reminded him that issuance of insurance certificates to non-customers was prohibited. On the same day, Califano presented Panchoosingh with a formal written shareholder agreement memorializing the terms and conditions of Panchoosingh's employment relationship with General Labor.

11. In November, 2004, plaintiff recommended Raj Persaud, also a Hindu of East Indian descent, to Califano and Minei for employment. Based on Panchoosingh's recommendation, Minei and Califano hired Persaud as branch manager trainee of the company's West Palm Beach/Lake Worth office.

12. In January 2005, Califano and Minei offered Panchoosingh a position as District Manager, with oversight responsibilities over General Labor's West Palm Beach/Lake Worth and the Stuart branch offices. Plaintiff contends that he did not accept this offered "promotion" because it would have involved a substantial (75%) loss in pay.

13. In February 2005, the company hired Jason Shephard – nephew of Larry Minei –as Human Resources Director and promptly charged him with responsibility of conducting audits of all branch offices. Following these audits, Shephard reported deficiencies at all branches and made

4

recommendations accordingly to every manager. With respect to plaintiff's West Palm/Lake Worth branch, Shephard reported a failure to properly administer earned income credit records and pay-outs to employees, failure to confirm employment eligibility and completion of I-9 forms, and failure to comply with various federal and state record keeping requirements.

14. In May, 2005, Shepard did a follow-up audit of plaintiff's branch at Califano's direction. This review led to issuance of a "Poor Performance" counseling memorandum signed by Califano and Minei, citing plaintiff for improper/ineffective training of the Lake Worth and Stuart branch managers and various performance deficiencies pertaining to proper verification of eligibility for employment, earned income credits, overtime payment discrepancies and failure to maintain check logs.

Under "other issues," Califano and Minei catalogued a list of other miscellaneous affronts, concluding with the following admonition:

> At this time we are starting to question your character and integrity. On several occasions you have intentionally tried to deceive or mislead members of management. Examples are related to training Amy in Stuart. Going into other branch territories and taking clients that belong to other branches. Improperly reporting mileage on your time expense reports. Mileage was overstated by 10 miles per trip and no mileage was subtracted from work to home for each trip.

15. On December 7, 2005, Califano and Minei called a meeting with Panchoosingh to discuss their concerns with his "current attitude towards the company and recent violations of Company policies." After they invited his comments on his "frustrations with the company," Panchoosingh complained that he did not receive the appropriate performance bonus compensation for September and October of 2005. Minei questioned whether Panchoosingh's contributions for the two months in question warranted a bonus, and left open for discussion whether a bonus would

be forthcoming for November.

According to a memo memorializing the meeting, apparently authored by Jason Shephard [DE# 31-14], at that point Califano, Minei and Shepard "switched directions" to discuss "recent events regarding Herman [sic], Gerardo Veloza and the subpoena to court involving Herman's personal life." First, they apparently called Panchoosingh to task for "negligence" in asking a subordinate (Veloza) to respond to a subpoena issued in his divorce case which was directed to General Labor's West Palm Beach office, conduct deemed not "befitting of an owner." Next, they addressed his "attitude" problem, with their remarks in this regard memorialized as follows:

> The comments, actions and failure to bring workplace disruptions and discord to the company will stop. Herman (sic) will no longer degrade or deface Gerry in front of other General Labor Employees and he will start acting like an owner.
>
> Larry and Gerry both put Herman (sic) on notice and informed him this is his last and final chance. Herman (sic) must change his attitude and make a commitment to the company. The next time he violates the company's code of ethics policy, try's (sic) to deceive or misrepresent the company, or makes degrading or inappropriate comments directed towards Gerry, Herman (sic) will be terminated and the Company will buy out his ownership shares per their agreement.
>
> At the conclusion of the meeting Larry asked if Herman (sic) had any comments or questions. Herman (sic) had none. In closing Gerry asked Herman (sic) is he wanted to work for the Company or if he wanted to end his relationship with General Labor and go his separate way. After some thought, Herman (sc) stated he would contact Gerry tomorrow morning and let him know then.

[DE# 31-14].

16. In February, 2006, Manei and Califano confronted Panchoosingh with allegations of: (a) a conflict of interest arising out of a certificate of insurance that General Labor had issued to Lima Brothers Construction, a company run by Panchoosingh and Persaud; [2] (b) a conflict of

---

[2] Persaud promptly resigned from General Labor after this allegation came to light. He has since testified that he issued this certificate himself and not at direction of Panchoosingh. The

6

interest involving Maia Landscaping, a landscaping company owned by Panchoosingh's girlfriend, which did business with General Labor at substantially reduced rates and used its Riviera Beach fax machine facilities; and (c) a fraudulent billing episode emanating out of the company's Riviera Beach office, involving a construction client, IBEX, which complained of job tickets filled out with names of workers who never showed up on the job; and tickets showing the same name entered multiple times on the same daily job ticket. [3]

17.  On March 6, 2006, Califano and Minei met with Panchoosingh and fired him, citing the above three examples of deficient performance. However, at the same time, Minei asked plaintiff to sign a written "Resignation and Release" agreement pursuant to which the company would give Panchoosingh 2.5% buy-out if he promised not to sue the company for wrongful termination. Panchoosingh refused to sign.

18.  Following his dismissal, Panchoosingh filed a timely charge of discrimination with the Equal Employment Opportunity Commission and received a right-to-sue letter. He then filed complaint in this court, alleging that General Labor discriminated against him on the basis of his

---

Company contends that Panchoosingh either knew of and/or directed the issuance of this certificate.
Panchoosingh denies any knowledge of the Lima Bros. insurance certificate, and counters that Califano and Minei themselves are share holders of companies called MC Labor Management, LLC, Waste Collection, Inc. and MC General Holding Co., all of which generated insurance certificates that would be considered a conflict of interest under this theory.

[3] Panchoosingh testified that fraudulent billing problems were commonplace at all branches, resulting from submission of forged time sheets by the work staff. In this case, he averred that the fraud went on for over four weeks before the customer complained and he investigated it, and that he ultimately was responsible for refunding the losses ($16,000) to the company.
Panchoosingh avers that other managers had similar types of billing fraud issues yet were not terminated. For example, he cites to Robert De la Paz, who acknowledged at deposition that his branch office suffered a $15,000.00 ticketing fraud charge and he was allowed to resolve the controversy by simply paying the money back to the company without further repercussion.

religion and national origin, all in violation of 42 U.S.C. § 2000e-2(a), and Fla. Stat. §760.10 (Counts 1 and 2), and also retaliated against him for voicing opposition to the company's unlawful alien worker employment practices in violation of the Florida Whistleblower Act (Count 3).

In his now operative amended complaint, he further alleges that the company breached the shareholder agreement by failing and refusing to pay him the full 5% shareholder dividend distribution due and owing since 2004 (Count 4)[4], and/or that he is entitled to recover his full five percent share of the declared dividend or net profit distributions of the company for years 2004, 2005, 2006 and 2007 under a theory of *quantum meruit*. (Count 5).

## II. Standard of Review

Summary judgment is appropriately entered only where the pleadings, discovery and disclosure materials on file show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Rule 56(c) Federal Rules of Civil Procedure.

An issue of fact is "material" if it is a legal element on the claim under the applicable substantive law which might affect the outcome of the case. *Allen v Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* Thus, the basic issue before the court on motion for summary judgment is whether the evidence presents sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986).

---

[4] In connection with this claim, he asserts that the company paid him approximately $50,000.00 in 2005, yet filed a false Schedule K-1 with the IRS indicating he was paid almost $160,000.00.

In ruling on summary judgment, the court must construe the evidence and all reasonably available factual inferences in the light most favorable to the party opposing the motion. *Adickes v S. H. Kress & Co.,* 398 U.S. 144, 158, 90 S. Ct. 1598, 26 L. Ed.2d 142 (1970)*; Mize v Jefferson City Bd of Educ., 93* F.3d 739, 742 (11th Cir. 1996).

Notwithstanding this advantage, a nonmoving plaintiff bears the burden of coming forth with sufficient evidence on each element that must be proved. *Earley v Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). Although the evidence need not be in a form necessary for admission at trial, unsupported, self serving allegations are generally insufficient to oppose a motion for summary judgment. *Harris v Ostrout*, 65 F.3d 912 (11th Cir. 1995).

In a Title VII claim based on circumstantial evidence, "if on any part of the *prima facie* case there would be insufficient evidence to require *s*ubmission of the case to a jury . . . [the court must] grant summary judgment [for the defendant]." *Earley*, 907 F.2d at 1080 (citations omitted). A "mere scintilla" of evidence in support of the plaintiff's position will be insufficient; there must be enough evidence on which a jury could reasonably find for that party. *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986). If the evidence is merely colorable, or os not significantly probative, summary judgment may be granted. *Id* at 249-50.

To survive summary judgment in a Title VII employment discrimination case, the plaintiff must present evidence, either direct or circumstantial, sufficient to allow a reasonable fact finder to conclude that the defendant intentionally and unlawfully discriminated against the plaintiff, i.e., in a religious discrimination case, plaintiff must adduce evidence sufficient to show that the employment decision at issue was made "on account of [the plaintiff's] religious beliefs." *Young v Southwestern Sav. & Loan Ass'n*, 509 F.2d 140, 143 (5th Cir. 1975).

9

### III.  Discussion

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq*. provides that "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's ... religion...." 42 U. S .C. § 2000e-2(a)(1).

The term "religion" is defined to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." 42 U. S C. § 2000e(j).

Religious discrimination under this paradigm arises where an employee alleges he or she was retaliated against because he or she was unable to fulfill a job requirement due to religious beliefs or observances. In this scenario, a *prima facie* case requires the employee to demonstrate that the belief or observance was religious in nature, that he called it to the attention of his employer, and that the religious belief or observance was the basis of his discharge or other discriminatory treatment. *Abramson v William Paterson College of New Jersey,* 260 F.3d 265 (3d Cir. 2001); *Beasley v Health Care Services Corp.,* 940 F.2d 1085, 1088 (7th Cir. 1991).

Another form of actionable religious discrimination under Title VII arises where the employee alleges that he was fired because he did not share or follow his employer's religious beliefs. *See e.g. Venters v City of Delphi*, 123 F.3d 956 (7th Cir. 1997), citing *Shapolia v Los Alamos National Laboratory,* 992 F.2d 1033, 1037 (10th Cir. 1993). Under this theory, applicable here, the claim is not that the employer refused to accommodate the employee's religious beliefs,

10

but rather that he was discharged because he did not measure up to his employer's religious expectations. Here, the employee need not demonstrate that he communicated his religious status and needs as he would had he complained that his employer failed to accommodate a particular religious practice. Rather, he need only show that his perceived religious shortcomings (e.g. in this case Panchoosingh's unwillingness to strive for salvation as Califano understood it) played a motivating role in his discharge. *See Venters v City of Delphi, supra*; 42 U.S.C. §2000e-2(m).

Viewed in this manner, Panchoosingh's Title VII claim presents a straightforward "religious harassment claim," similar to the familiar "*quid pro quo*" sexual harassment case, only here the operative question is whether his employer demanded that he alter or renounce his religious beliefs in exchange for job benefits or security. *See e.g. Venters, supra* (summary judgment precluded by fact question on what role radio dispatcher's religion, or police chief's perception of her religion, played in discharge*)*.

As in any other discriminatory discharge case, the plaintiff in a religious harassment case can establish that he was discharged on the basis of religion through direct or indirect means. Direct evidence is evidence which, if believed, proves the existence of fact without inference or presumption. *Schonfeld v Babbitt,* 168 F.3d 1257, 1266 (11th Cir. 1999). As precedent of the Eleventh Circuit illustrates, "only the most blatant remarks whose intent could be nothing other than to discriminate on the basis of some impermissible factor constitutes direct evidence of discrimination." *Rojas v Florida*, 285 F.3d 1339 (11th Cir. 2002); *Damon v Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354 (11th Cir. 1999).[5]

---

[5] That is, direct evidence of discriminatory intent derives from derogatory statements which are directly related to the decision making process. *See e.g. Taylor v Runyon*, 175 F.3d 861 (11th Cir. 1999)(statement to a female job applicant that she did not receive the job because a male job

11

For example, in the context of religious discrimination, a statement like "I'm firing you because you're ... a Christian" would be direct evidence of unlawful discrimination. *See Venters, supra* at 972-73. On the other hand, stray, inappropriate comments without a direct nexus to to the adverse employment decision in question will not suffice. *See e.g. Scott v Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223 (11th Cir. 2002(racially derogatory remark made by white co-worker toward black employee approximately two and one-half years before black employee was terminated was not direct evidence of race discrimination). This follows because such comments in isolation may reflect a personal prejudice or bias, but do not necessarily reflect company policy. *See e.g. Heim v State of Utah*, 8 F.3d 1541, 1546-47 (10th Cir. 1993)(manager's remark "Fucking women, I hate having fucking women in the office" not direct evidence of discriminatory intent); *Equal Employment Opportunity Commission v Wiltel, Inc.*, 81 F.3d 1508 (10th Cir. 1996)(interviewer's comment "I don't like Ellie because she is into all that Jesus shit and she doesn't fit in" not direct evidence of discriminatory intent).

In this case, the court agrees that the derisive comments allegedly made by Califano concerning plaintiff's homage to "the rat god" are not direct evidence of discriminatory intent because they are not directly linked to the adverse decision-making process. On the other hand, his his alleged comment to the effect that "This is a Christian company and there is no place in it for anyone who is not Christian," viewed in the context described by Panchoosingh, does smack of direct evidence of discriminatory intent, as it is a policy statement made by a relevant decision-

---

applicant had a family to support constituted direct evidence of discrimination); *Buckley v Hosp. Corp of America*, 758 F.2d 1525, 1530 (11th Cir. 1985)(decision maker's comments regarding "longevity " of employees, need for "new blood," desire to recruit younger employees, and the plaintiff's "advanced age" constituted direct evidence of age discrimination).

maker which evinces an illegal bias to recruit and retain only Christian, or converted Christian, employees. *See e.g. Venters, supra*. It qualifies as direct evidence of discriminatory intent because no inferential step is needed to journey from the statement to the ultimate point which plaintiff seeks to prove, i.e. that Califano's decision to fire him was borne of religious discriminatory animus.

However, even without this specific piece of evidence, the court finds sufficient circumstantial evidence of discriminatory intent under the familiar *McDonnell-Douglas* framework to establish plaintiff's *prima facie* case. Under this paradigm, a Title VII plaintiff must establish that: (1) he is a member of a protected class; (2) he was subjected to an adverse job action; and (3) similarly situated employees outside his protected class were treated more favorably. *Wilson v B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). If he succeeds, the employer must articulate a legitimate, non-discriminatory reason for its action. If the employer carries this burden, the presumption of discrimination is rebutted and the burden of production shifts back to plaintiff to proffer evidence that the alleged reason of the employer is a mere pretext for illegal discrimination. *Id.*

Recognizing that the quantity and quality of comparator misconduct must be nearly identical to establish a *prima facie* case under this model, *Cuevas v American Express Travel Related Services,* 256 Fed Appx. 241 (11th Cir. 2007), the court finds plaintiff meets his initial burden of proving disparate treatment among similarly situated employees here with evidence that branch managers Robert De La Paz and Robert Conde -- Catholics who accepted Bibles from Califano, were re-baptized and accepted or at least tolerated without criticism Califano's proselytizing and "witnessing" throughout the work day -- were retained despite evidence that Shephard also faulted the branch offices under their command for the same or similar deficiencies as Panchoosingh's

13

office. Further, there is evidence that De La Paz's office in particular suffered a substantial job ticketing fraud loss ($15,000) which he was allowed to rectify without losing his employment. Finally, plaintiff demonstrates that the other managers were paid the 5% dividend distribution due under their respective shareholder agreements for years 2004 and 2005, while plaintiff – who was openly critical of Califano's constant proselytizing and resisted the urged conversion to Christianity– did not.

The court finds this evidence of disparate treatment between plaintiff and similarly situated branch managers sufficient to create an issue of fact on the issue of whether unlawful discriminatory intent played a role in the decision to terminate him, and hence suffices to establish a *prima facie* case of religious discrimination under the *McDonnell-Douglas* paradigm. *See generally Boumehdi v Plastag Holdings*, 489 F.3d 781 (7th Cir. 2007); *Anderson v WBMG-42*, 253 F.3d 561 (11th Cir. 2001).

This shifts the burden to General Labor to articulate a legitimate, non-discriminatory reason for its actions. It accomplishes this here by citation to the following various episodes of alleged malfeasance on the part of Panchoosingh: (1) the $16,000 job ticketing fraudulent billing episode emanating out of Panchoosingh's Riviera Beach office; (2) the conflict of interest allegedly created by Panchoosingh's status as officer of Lima Bros. Construction, a non-customer receiving a certificate of insurance from General Labor; (3) the conflict of interest allegedly created by discounted billing rates which Panchoosingh's office provided to Maia Landscaping, a company owned by Panchoosingh's girlfriend that was delinquent on its account; (4) Panchoosingh's alleged failure to ensure compliance with immigration and tax laws and failure to adequately train managers.

Through its proffer of evidence on these alleged transgressions, General Labor satisfactorily

articulates a legitimate, non-discriminatory reason for plaintiff's termination, shifting the burden back to Panchoosingh to show that the proffered reasons are mere pretext for religious and/or national origin discrimination. Plaintiff accomplishes this here through various comments made by Califano, which, read in context of the entire record, might lead a reasonable jury to disbelieve that religious considerations did play a role in Califano's decision to discharge him.

By Panchoosingh's account, from the beginning of his tenure at General Labor, Califano made it clear that he was a Christian who believed that his decisions as executive officer of the company should be guided by the principles of his faith, and that his mission was to save as many people as he could by converting them to Christianity. There is evidence that in daily conversations with Panchoosingh, other branch managers and customers -- all of which occurred during work hours --Califano constantly interjected his religious observations and quoted from the Bible.

There is also evidence that he mocked plaintiff about his religious beliefs in a way that suggested he considered Pancahoosingh sacrilegious for paying homage to false idols. In effort to save his soul, he provided Panchoosingh with an engraved Bible and invited him to his church for fish fries and holy day observations. Califano constantly pressured him to bring his thinking and conduct into conformity with the principles of his own religious beliefs, and hinted that there "was no place" in the company for him if he was unwilling to do so. According to Panchoosingh, this advice was all unsolicited and unwelcome, but he endured it for a period of time, even joining Califano at an occasional church service and at least one fish fry.

If believed, this evidence could lead a reasonable jury to conclude that once it became apparent that Panchoosingh had no intention of actually converting to Christianity or "saving" himself through baptism, Califano turned on him and started looking for reasons to dismiss him, with

painstaking documentation of Panchoosingh's alleged infractions and various counseling sessions along the way as a pretextual basis for his action. Further, the company's offer to give Panchoosingh a 2.5% buy-out in exchange for his "resignation" and promise not to sue at the time of his termination itself raises a question on the sincerity of the company's proffered reasons for terminating him.

At a minimum, the conflict created between each side's version of events raises a genuine issues of material fact on the issue of pretext which is appropriately resolved by a jury. On the one hand, Panchoosingh describes a work environment dominated by a supervisor bent on reforming his religious beliefs, one who repeatedly encouraged him to be "saved" through baptism and ultimately discharged him when he failed to conform to his religious expectations. On the other hand, General Labor describes a lax manager and shareholder with conflicting allegiances to other persons and corporations, messy bookkeeping practices, and flagging sales performance who was patiently tolerated until the IBEX ticketing fraud episode operated ad "the last straw" to break the company's back.

Upon this evidentiary background, it is for a jury to decide what role Panchoosingh's Hindu religious affiliation (or Califano's perception of that affiliation) played in his discharge and whether the reasons proffered by General Labor to justify his dismissal were mere pretext for religious and/or national origin discrimination. Accordingly, the defendant's motion for summary judgment on the Title VII and related state law employment discrimination claims shall be denied.

## B. Florida Whistleblower's Act Claim

The plaintiff's third claim is brought under Florida's Whistlebower Act, which states in pertinent part:

> An employer may not take any retaliatory personnel action against an employee because the employee has:
>
> (3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule or regulation.

§ 448.102(3), Fla. Stat. (2003).

Whistleblower claims under this statute are analyzed under the same framework used to organize Title VII retaliation claims. *Sierminski v Transouth Financial Corp.,* 216 F. 3d 945 (11th Cir. 2000). Thus, to establish a *prima facie* whistleblower case in the absence of direct evidence of retaliatory intent, a plaintiff must show : (1) there was a statutorily protected participation; (2) an adverse employment action occurred, and (3) a causal link exists between the participation and the adverse employment action. *Olmsted v Taco Bell Corp..* 141 F.3d 1457, 1460 (11th Cir. 1998). A plaintiff satisfies this third element if he provides sufficient evidence "of knowledge of the protected expression and "a close temporal proximity between this awareness and the adverse ... action." *Higdon v Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

Once a *prima facie* case is established, the employer may proffer legitimate, non-retaliatory reasons for the adverse employment actions. If the employer carries this burden, the plaintiff must then come forward with evidence sufficient to create a genuine issue of fact that each of the proffered reasons are merely pretext for unlawful retaliation. *Combs v Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

In establish the first element of his *prima facie* claim under this Act, plaintiff asserts that

he continuously objected to and voiced concerns about the company's use of unauthorized alien workers to fill staffing requirements at General Labor job sites in violation of various federal immigration laws. Specifically, he claims that he complained of such illegal employment practices as early as 2003 to Califano, and later voiced similar complaints to the human resources manager.

To meet the second element, Plaintiff shows that Califano fired him on March 6, 2006.

His claim falls, however, for insufficient proof on the third, "causal connection" element. The record suggests that Califano was the primary decision maker in his termination, and there is evidence that Califano was aware that plaintiff complained about illegal alien hiring practices in early 2003. However, this knowledge, standing alone, is insufficient to raise a fact issue on causation because it is too remote from the termination which occurred in March 2006. That is, the gap of time between these events is too protracted to permit a reasonable inference that the termination was caused by protected activity. *See e.g. Higdon v Jackson,* 393 F.3d 1211, 1221 (three month period between protected activity and adverse action without more held insufficient to establish causation); *Wascura v City of South Miami,* 257 F.3d 1238 (11th Cir. 2001); *Sierminiski v Transouth Financial Corp*, 216 F.3d 945 (11th Cir. 2000)(employee termination not causally related to complaints where there was seven month gap between complaints and termination and record was replete with reasons for termination unrelated to complaint); *Bell v Georgia Pacific Corporation,* 390 F. Supp. 2d 1182 (M.D. Fla. 2005).

Because he fails to create an issue of fact on the element of causation, plaintiff is unable to establish a *prima facie* case under the Florida Whistleblower Act and summary judgment upon this claim shall accordingly enter in favor of the defendant.

### III. CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1. The defendant's motion for summary judgment is **GRANTED** on the plaintiff's claim under the Florida Whistleblower Act (Count 3), and partial final summary judgment in favor of the defendant shall enter accordingly upon this claim.

2. The motion is **DENIED** on the plaintiff's religious and national origin discrimination claims under Title VII, 42 U. S. C. § 2000e *et seq*. and §760.10, Fla. Stat. (2003) (Counts 1 and 2).

3. The plaintiff's employment discrimination claims (Counts 1 and 2) and companion claims for breach of shareholder agreement (Count 4) and *quantum meruit* (Count 5), remain scheduled to be tried on the May, 2009 trial calendar and all parties should govern themselves accordingly.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 8th day of April, 2009.

                                                Daniel T. K. Hurley
                                              United States District Judge

cc. All counsel

For updated court information, visit unofficial Web site at http://us.geocities.com/uscts